UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :

GLOBIS CAPITAL PARTNERS, L.P.,        :
                                              :

                    Plaintiff,          :                  **COMPLAINT**

                                              :

                -against-           :         **13 Civ. 3385 (VM)**

                                              :

THE CASH STORE FINANCIAL SERVICES   :         **ECF CASE**
INC. and GORDON REYKDAL,         :

                    Defendants.     :

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff Globis Capital Partners, L.P. ("Globis Capital"), by its attorneys, Hoffner PLLC, as and for its complaint against defendants The Cash Store Financial Services, Inc. ("Cash Store" or the "Company") and Gordon Reykdal ("Reykdal") for violations of the federal securities laws, alleges as follows:

## NATURE OF ACTION

       1.      Throughout 2012, Plaintiff purchased shares of the common stock of Cash Store on the New York Stock Exchange (NYSE: CSFS) and held such shares when the Company announced, before the market open on December 10, 2012, that it had overstated its assets by $44 million and would be issuing restatements (the "Restatements") of its previously issued interim financial statements for the three and six months ended March 31, 2012, and the nine months ending June 30, 2012 (the "Restatement Period").

       2.      In its press release, Cash Store admitted that the consumer loans (the "Loans") and "intangible assets" it had purchased for $116 million in January 2012 (the

"Loan Transaction") from certain third party lenders (the "Third Party Lenders") were worth nearly $37 million less than the Company had previously represented. Cash Store also acknowledged that it had previously overstated the fair value of its internally generated loans by an additional $7 million.

3.      Not surprisingly, given these massive and inexplicable valuation adjustments, the Company disclosed that it had concluded that it had "material weaknesses" during the Restatement Period and that its "internal controls" were "ineffective."

4.      As a result of these corrective disclosures, on December 10, 2012, the market price of Cash Store shares traded on the NYSE plummeted 19%.

5.      But the Company had still not disclosed all the material facts regarding the Loans and the Loan Transaction. Over the next several months, Cash Store continued to trickle out more details regarding the fraudulent misrepresentations and actionable omissions that had led to its Restatements.

6.      On January 4, 2013, more than three weeks after the Restatement Release, Cash Store finally acknowledged that the two biggest beneficiaries of the $37 million cash giveaway to the Third Party Lenders were entities owned and/or managed by family members of certain undisclosed Company officers and directors.

7.      Furthermore, the Company finally acknowledged that the Company's inquiry into the accounting for the Loan Transaction was prompted by a whistleblower complaint to Cash Store's Audit Committee (the "Whistleblower Allegations"), which in turn had resulted in the formation of a Special Committee of the Board to conduct an investigation.

8.      It took yet another month, however, for the Company to finally disclose the incestuous nature of the Loan Transaction and the Company's $37 million overpayment.

9.      On February 1, 2013, Cash Store buried in its Form 20-F filed with the SEC the stunning admission that the biggest recipient ($45.5 million) of the enormous overpayment to the Third Party Lenders was an entity owned and managed by the father and brother of Cameron Schiffner ("Schiffner"), the son-in-law of Cash Store's Chairman and CEO, defendant Reykdal.

10.     Cash Store's piecemeal admission, after a year of making no related party disclosures whatsoever, that the Loan Transaction included a $37 million "Premium" paid to relatives of the Company's officers and directors demonstrates a knowing and deliberate effort by Defendants to violate the federal securities laws by fraudulently misrepresenting and concealing the true facts of this unlawful transaction from the investing public.

## THE PARTIES

11.     Plaintiff Globis Capital Partners, L.P. ("Globis Capital") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 805 Third Avenue, New York, NY  10002.  Throughout 2012, Globis Capital purchased shares of the common stock of Cash Store (the "Shares") on the NYSE, and held such Shares through the close of trading on December 10, 2012, and through the close of trading on February 5, 2013, and has been damaged thereby.

12.     Defendant Cash Store is a corporation organized and existing under the laws of Canada with its principal place of business located at 15511 123 Avenue Edmonton, Alberta, Canada T5V 0C3.  Upon information and belief, Cash Store operates

512 branches across Canada under the Cash Store Financial and Instaloan$ names and 25 branches in the United Kingdom, "acting primarily as lenders and brokers to facilitate short-term advances to income-earning consumers who may not be able to obtain them from traditional banks."  Shares of the common stock of Cash Store are listed on the Toronto Stock Exchange (TSX: CSF) and the NYSE (NYSE: CSFS).

13.    At all relevant times, defendant Reykdal was the Chairman of the Board of Directors ("Chairman") and Chief Executive Officer ("CEO") of Cash Store.  As Chairman and CEO, Reykdal was privy to confidential and proprietary information concerning Cash Store, its operations, finances, financial condition, regulatory issues, and business prospects.  In particular, he knew or was reckless in not knowing that the Company had wildly overpaid the Third Party Lenders for the Loans and that the valuation of the Loans included in the Company's financial statements were false.  Moreover, Reykdal knew and failed to disclose that the biggest beneficiary of this massive act of corporate waste (as well as the Company's "voluntary" Retention Payments) was an entity controlled and managed by his son-in-law's immediate family.

14.    Notwithstanding his knowledge of the true facts regarding the related party nature of the Loan Transaction and Retention Payments, as well as the massive overvaluation of the Loans on the Company's balance sheet, Reykdal certified financial statements that contained no related party transaction disclosures whatsoever, stating: "Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim

filings."  Given defendant Reykdal's knowledge of the undisclosed facts about the Loan Transaction and the Retention Payments, such certifications were fraudulent.

15.      In addition to his liability as a direct participant in the wrongs complained of herein, Reykdal, by reason of his status as CEO and Chairman of Cash Store, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of his position of control, Reykdal was able to and did control the making of the fraudulent misrepresentations and actionable omissions in Cash Store's public filings and press releases.

## JURISDICTION AND VENUE

16.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j (b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

17.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

18.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein occurred in substantial part in this District.

19.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE, a national securities market located in this District.

## FACTUAL ALLEGATIONS

**The Fraudulent Interim Financial Statements**

20.     On February 9, 2012, Cash Store filed with the United States Securities and Exchange Commission (the "SEC") a Form 6-K for the month of February 2012, annexing the Company's Interim Consolidated Financial Statements for the three months ended December 31, 2011 (the "December 2011 Financials").

21.     On May 14, 2012, Cash Store filed with the SEC a Form 6-K for the month of May 2012, annexing the Company's Interim Consolidated Financial Statements for the three and six months ended March 31, 2012 (the "March 2012 Financials").

22.     The December 2011 Financials and March 2012 Financials disclosed that Cash Store, which operates hundreds of retail loan stores across Canada and the U.K., acts as both a lender and a broker of short-term consumer loans.  The filings explained that when Cash Store acts as a broker, loans are funded by "independent third-party lenders" (emphasis added).

23.     In the December 2012 Financials and March 2012 Financials, the Company represented that such loans were payable to, and assets of, the Third Party Lenders, and that "responsibility for losses suffered on account of uncollectible loans rests" with the Third Party Lenders.

24.     Although the Company claimed in its December 2011 Financials and March 2012 Financials that its contractual arrangements did not obligate it to "compensate [the purportedly "independent" Third Party Lenders] for loan losses without cause or provide a guaranteed rate of return on the pool of funds advanced," the Company curiously claimed that, "as consideration to those lenders that continue[d] to be

willing to fund advances to the Company's customers," it "voluntarily" made quarterly

cash payments of millions of dollars to Third Party Lenders (the so-called "Retention

Payments") "to lessen the impact of loan losses" (emphasis added).

**The January 2012 Acquisition Of Loans From The Third Party Lenders**

25.    The March 2012 Financials disclosed for the first time that, on January 31,

2012, the Company had acquired the Loans from the "independent" Third Party Lenders

for total consideration of $116.334 million.

26.    The March 2012 Financials allocated $80.334 million of the $116.334

purchase price of the Loan Transaction to the market value of the acquired "consumer

loan portfolio."  The remainder of the purchase price was allocated to "intangible assets"

as follows:

| | | |
|---|---|---:|
| Consumer loan portfolio | | $80,334 |
| Non-compete agreement | | 18,998 |
| Favorable supplier relationships | | 17,369 |
| Proprietary knowledge | | 2,714 |
| Total acquired assets | | 119,415 |
| Deferred tax liability | | 3,081 |
| Total purchase price | $ | 116,334 |

27.    The March 2012 Financials provided no further explanation as to the

origin or the valuation of the alleged intangible assets acquired in the Loan Transaction.

28.    The March 2012 Financials made no "related party" disclosures as to any

connections between the Third Party Lenders that received the $116 million and Cash

Store's officers and directors.  Nor did the December 2012 Financials or March 2012

Financials make any related party disclosures with respect to the Retention Payments.

29.    The December 2011 and March 2012 Financials were certified by Cash

Store's CEO Reykdal, and its Chief Financial Officer, Nancy Bland ("Bland").  Both

Reykdal and Bland certified:  "Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings."

**CFO "Resigns"**

30.   On May 30, 2012, two weeks after the filing with the SEC of the March 2012 Financials, Cash Store suddenly announced the resignation of its CFO, Bland.  The Company provided no explanation for Brand's abrupt departure other than to state that she was leaving the Company to join her family's business, an equipment sales and service company in Edmonton.

31.   In the same press release, the Company announced that Craig Warnock ("Warnock") had been appointed the Company's new CFO, effective July 1, 2012 (the first day of the Company's fiscal fourth quarter).  The Company provided no explanation as to why Warnock's appointment was not "effective" immediately.

**The June 2012 Interim Financials**

32.   On August 13, 2012, Cash Store filed a Form 6-K with the SEC annexing its Interim Consolidated Financial Statements for the three and nine months ended June 30, 2012 (the "June 2012 Financials").  The June 2012 Financials repeated the same disclosures regarding the Loans and the Loan Transaction that were contained in the March 2012 Financials.  Once again, the June 2012 Financials made no "related party" disclosures regarding the Retention Payments or the Loan Transaction.

**The Whistleblower Allegations**

33.     Based on subsequent Company filings, it appears that, in or about October 2012, an undisclosed individual (the "Whistleblower") contacted the Audit Committee of the Company's Board of Directors and alerted it to the existence of "written communications that contained questions" about the Company's accounting for the Loans from the Third Party Lenders, including allegations regarding the existence of "undisclosed related party transactions" that had resulted in "inappropriate benefits" to such related parties in connection with the Loan Transaction.

34.     In response to these Whistleblower Allegations, the Company's Board of Directors appointed a Special Committee of the Board of Directors (the "Special Committee") to conduct a special investigation (the "Special Investigation").  The Special Committee retained legal counsel, which, in turn, retained an independent accounting firm to assist it in the Special Investigation.

**The Restatement Announcement**

35.     Prior to the market open on December 10, 2012, Cash Store issued a press release (the "Restatement Release") announcing that it would restate the March 2012 Financials and June 2012 Financials.

36.     The Restatement Release disclosed for the first time that the Company's previously issued interim financial statements had overstated the value of the Loans by nearly $30 million and the value of all of the purported assets acquired in the Loan Transaction by almost $37 million:

> During the preparation of the September 30, 2012 annual
> consolidated financial statements the Company determined that
> approximately $36.8 million of the total consideration paid to

acquire the portfolio of loans represented a premium paid on
acquisition.

37.    The Restatement Release made no effort to explain what had caused the

Company to reassess the Loan Transaction and determine that a "premium of $36.8

million [the "Premium"] should have been recognized as an expense as a settlement of

pre-existing business relationships with third-party lenders."

38.    In an effort to obfuscate why it had so dramatically overpaid the Third

Party Lenders for the Loans, the Company stated:

> The pre-existing contractual broker arrangements between the
> Company and the third-party lenders did not obligate the Company
> to pay retention payments, compensate for loan losses without
> cause or provide a guaranteed rate of return on the pool of funds
> advanced.  However, the compensation paid to the third party
> lenders as part of the transaction recognized the loss of future
> retention payments and the ability to earn future returns on capital
> under the existing broker contracts.

39.    The Restatement Release made no related party disclosures with respect to

the Loan Transaction or Retention Payments and did not mention the existence of the

Whistleblower Allegations.

40.    In addition to recognizing a $37 million overvaluation of the Loans, the

Restatement Release disclosed that the Company had determined that its provision for

loan losses on internally generated loans was also understated and that, as a result, the

Company had to record an additional expense of $7 million for the six month period

ended June 30, 2012.

41.    Finally, the Restatement Release announced that the Company had "re-

evaluated its conclusions regarding the effectiveness of its internal control over financial

reporting for the affected periods and determined that material weaknesses existed at

March 31, 2012 and June 30, 2012." As a result of such material weaknesses, the Company had concluded that its internal controls during the Restatement Period were "ineffective."

**Cash Store Stock Plummets On News Of The Restatement**

42.     The announcement by Cash Store that it would be restating its March 2012 Financials and June 2012 Financials to record a $36.8 million "Premium" for the Loans and a write down of an additional $7.0 million for "internally generated" loans caused the market price of shares of Cash Store traded on the NYSE to plummet. By the close of trading on December 10, 2012, the price of Cash Store shares had dropped 20%, falling from its closing price of $4.27 on December 9, 2012, to $3.42 per share.

**The Restatements**

43.     On January 3, 2013, Cash Store filed with the SEC a Form 6-K/A annexing Restated Interim Consolidated Financial Statements for the three and six months ended March 31, 2012 and a Form 6-K/A annexing Restated Interim Consolidated Financial Statements for the period ended June 30, 2012. The Restatements were certified by the Company's CEO, defendant Reykdal, and its CFO, Craig Warnock.

44.     The Restatements represented that the Company had suffered a pre-tax loss of $56.490 million for the nine months ending June 30, 2012, rather than the $12.964 million pre-tax loss that it had originally reported.

45.     The Restatements dramatically highlighted the impact of the fraudulent accounting for the Loans and Loan Transaction on Cash Store's financial performance. Instead of earning $9.0 million as it had in FY2011, Cash Store – pressured by the

Whistleblower to recognize, *inter alia*, the $36.8 million fraudulently hidden Loan

Transaction "Premium" -- had actually suffered a net loss of $43.1 million for FY2012.

46.     The restated accounting for the Loan Transaction with the Third Party

Lenders was startling – the consumer loan portfolio, which was the only tangible asset

purchased for the $116 million paid to the Third Party Lenders, was now said to be worth

only $50 million.  Incredibly, the Company was admitting that it had paid the Third Party

Lenders $66 million more than the Loans were worth.

47.     Once the enormous overvaluation was unveiled and the "premium"

giveaway paid to the Third Party Lenders accounted for, the Company's EBITDA

decreased to *negative* $30.8 million from $24.5 million in FY2011.

48.     In the January 3, 2013 Restatements, the Company disclosed the

Whistleblower Allegations and the related party nature of the Loan Transaction for the

first time:

> Subsequent to September 30, 2012, the Company's Audit
> Committee was made aware of written communications that
> contained questions about the acquisition of the consumer loan
> portfolio from third-party lenders in late January 2012 and
> included allegations regarding the existence of undisclosed related
> party transactions in connection with the acquisition.

49.     Most significantly, the Restatements acknowledged the existence of

"related party transactions in connection with" the Loan Transaction   After a year of

hiding the facts, the Company admitted that the Third Party Lenders that received the

largest shares of the $116 million were controlled and/or managed by immediate family

members of the Company's officers or directors.

50.     The Restatements disclosed that the Third Party Lenders that sold the

Loans to Cash Store included an entity controlled and managed by an undisclosed

immediate family member of an undisclosed member of the Company's management. This lender had received $45.52 million of the $116.334 million purchase price for the Loans, as well as Retention Payments of $3.990 million for the nine months ended June 30, 2012.

51.     The Restatements also disclosed that Third Party Lenders that sold the Loans to Cash Store also included an entity "funded" by an immediate family member of a member of the Company's Board of Directors.  This lender received $23.944 million of the $116.334 million purchase price for the Loans, as well as Retention Payments of $1.377 million for the nine months ended June 30, 2012.

52.     The Restatements still however did not disclose the identity of the related party recipients of the Retention Payments and Loan Transaction Premium.

53.     Finally, on February 1, 2013, in its Form 20-F filed with the SEC, the Company at last admitted that the related Third Party Lender that had received $45.5 million of the proceeds from the Loan Transaction is controlled by the father of CEO Reykdal's son-in-law, Schiffner, a Cash Store senior vice president.

54.     The Form 20-F also disclosed that Schiffner's brother is a member of management of the Schiffner entity (the "Schiffner Entity") and, on behalf of the Schiffner Entity, signed the Loan Transaction agreement that resulted in the massive $37 million (if not greater) overpayment by Cash Store to the Third Party Lenders.

55.     The Form 20-F also disclosed that, over a three-year period, Cash Store had made "voluntary" Retention Payments to the Schiffner Entity totaling more than $29 million.

56.     The Form 20-F also provided new disclosures as to the other related Third Party Lender.  Cash Store now admitted that the Third Party Lender that had received $24 million of the $116 million paid by Cash Store for the Loans (the "Shaw Entity") was funded by an immediate family member of its director, Michael Shaw, as well as Bruce Hull, a director of its Australian affiliate.

57.     Cash Store also disclosed for the first time that, over a three-year period, it had made "voluntary" Retention Payments to the Shaw Entity totaling more than $12 million.

58.     On February 5, 2013, after the close of the market, Cash Store announced that the Registrar for payday loans in Ontario, Canada, had issued a proposal to revoke the Company's payday lending licenses and disclosed that, since September 2011, the Consumer Protection Branch of the Ministry of Consumer Affairs of Ontario has attempted to force the Company to deliver payday loans in cash and to prohibit Cash Store from selling products other than payday loans.

59.     As a result of this corrective disclosure, the market price of Cash Store shares on the NYSE dropped another 8% (falling from a close of $4.06 on February 5, 2013, to a close of $3.73 on February 6, 2013).

60.     On May 13, 2013, approximately three months after announcing the Restatements, Cash Store announced that the Restatements and other filings would have to be restated.  This time, the Company had apparently under-accrued by $8.2 million for a settlement of a consumer class action in British Columbia.  The Company claimed that its most recent false filings were "caused by a misunderstanding of the [] terms and conditions" of its own litigation settlement.

61.     On May 14, 2013, the Company announced that as a result of its latest restatement, the Alberta Securities Commission had ordered a halt in all trading and purchasing of Cash Store shares.

62.     On May 15, 2013, Cash Store issued a press release announcing that the Special Committee had concluded its Special Investigation.  The Company provided no disclosures whatsoever, however, regarding the factual findings and legal conclusions of the Special Committee.

63.     In the May 15, 2013 press release, the Company did, however, admit for the first time that the Special Investigation had, not surprisingly, included a review of allegations by the Whistleblower that the Loan Transaction had resulted in "inappropriate benefits" to the family members of its officers and directors.

**Additional Evidence of the Company's Scienter**

64.     The allegations above establish a strong inference that, at all relevant times, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

65.     Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Cash Store's true operating condition from the investing public as well as improper payments to the Third Party Lenders, the two largest of which were secretly owned by family members of the Company's officers and directors.  By misrepresenting

and omitting these material facts, Defendants artificially inflated the price of its stock traded on the NYSE.

66.     The Company's explanation for the accounting for the Loan Transaction and the rationale for why it paid the Third Party Lenders $36.8 million more than the Loans and "intangible assets" is itself evidence of fraud.  Cash Store has not explained why the consideration it paid to the Third Party Lenders, including the Schiffner Entity and Shaw Entity, would have included consideration beyond the fair value of the Loans and intangible assets.

67.     If, as Defendants have always claimed, the Company had no contractual obligation to the Third Party Lenders "to pay retention payments, compensate for loan losses or provide a guaranteed rate of return," and had no legal obligation to continue to broker loans through the Third Party Lenders, then there was no valid business purpose for the $36.8 million Premium and it was not the "settlement of pre-existing business relationships with third-party lenders."

68.     If, on the other hand, the Company did have a legal obligation of some kind to the Third Party Lenders to provide them with a guaranteed return, then Defendants have been lying to the market and engaged in fraud for years and misrepresenting the nature of the Retention Payments.

69.     Accordingly, Defendants either fraudulently misrepresented the Company's obligations to the Third Party Lenders, or fraudulently concealed a breach of fiduciary duty resulting in a massive cash giveaway to defendant Reykdal's family and other related parties.  In either event, Defendants knowingly and purposefully engaged in

a conspiracy fraudulently to conceal the true nature of the Loan Transaction and the

Retention Payments from the public.

**Fraud On The Market And Presumption Of Reliance**

70.     The false and misleading statements set forth herein were widely

disseminated to the securities markets, investment analysts, and to the investing public.

Those statements caused and maintained the artificial inflation of the price of Cash Store

common stock, which consequently traded at prices in excess of its true value.

71.     Plaintiff is entitled to the presumption of reliance established by the fraud-

on-the-market doctrine.  At all relevant times, the market for Cash Store shares was an

efficient market for the following reasons, among others: (a) the shares met the

requirements for listing, and were listed and actively traded on the NYSE, a highly

efficient, electronic stock market; (b) as a regulated issuer, Cash Store filed periodic

public reports with the SEC and the NYSE; and (c) Cash Store regularly communicated

with public investors via established market communication mechanisms, including

regular disseminations of press releases on the national circuits of major newswire

services and other wide-ranging public disclosures, such as communications with the

financial press and other similar reporting services.

72.     Plaintiff also read, or listened to, and relied on certain of Defendants'

materially false and misleading statements prior to purchasing Cash Store common stock

at artificially inflated prices, including, but not limited to, the December 2011 Financials,

the March 2012 Financials and June 2012 Financials.  Plaintiff specifically read and

relied upon Defendants' false and misleading statements pertaining to, among other

things, the Loan Transaction, the Loans, the Retention Payments, the Third Party

Lenders, the Company's publicly reported financial results, compliance with GAAP, the adequacy of internal controls and the integrity of management.

## COUNT I
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
(Against All Defendants)

73.     Plaintiff repeats and realleges herein by reference paragraphs 1 through 72 of the Complaint.

74.     Between February 9, 2012 and February 6, 2013, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained fraudulent misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for shares of the common stock of Cash Store. Plaintiff would not have purchased the Shares at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## COUNT II
### (Violation of Section 20(a) of the Exchange Act)
(Against Defendant Reykdal)

76.     Plaintiff repeats and realleges herein by reference paragraphs 1 through 72 of the Complaint.

77.     Defendant Reykdal acted as a controlling person of Cash Store within the meaning of Section 20(a) of the Exchange Act.  By reason of his positions as Chairman and CEO of Cash Store, Reykdal had the power and authority to cause the Company to

engage in the wrongful conduct complained of herein.  By reason of such conduct, Reykdal is liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Awarding compensatory damages in favor of Plaintiff against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.   awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.   such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
       May 20, 2013

                    **HOFFNER PLLC**

                    By: _____/s/_____
                        David S. Hoffner
                        hoffner@hoffnerpllc.com
                        325 Broadway, Suite 505
                        New York, New York 10007
                        Tele: (917) 881-1039
                        Fax: (646) 810-4031
                        *Attorneys for Plaintiff*
                         *Globis Capital Partners, L.P.*